EDMUND A. SARGUS, JR., CHIEF UNITED STATES DISTRICT JUDGE
Defendant's Motion to Exclude Expert Opinion Related to Specific Causation
This matter is before the Court on Defendant's Motion to Exclude the Testimony of Trial Plaintiff David Freeman's Specific Causation Expert, Dr. Robert Bahnson (ECF No. 4314), Plaintiff's Memorandum in Opposition to Defendant's Motion (ECF No. 4334), and Defendant's Reply in Support of its Motion (ECF No. 4347). For the reasons set forth below, the Court DENIES Defendant's motion.
I.
Plaintiff David Freeman's trial is scheduled for May 31, 2016, as the second bellwether trial of the over 3500 cases that make up this multidistrict litigation ("MDL"). The Judicial Panel on Multidistrict Litigation describes the cases in its Transfer Order as follows:
All the actions are personal injury or wrongful death actions arising out of plaintiffs' alleged ingestion of drinking water contaminated with a chemical, C-8 (also known as perfluorooctoanoic acid (PFOA) or ammonium perfluorooctanoate (APFO) ), discharged from DuPont's Washington Works Plant near Parkersburg, West Virginia. All of the plaintiff's in this litigation allege that they suffer or suffered from one or more of six diseases identified as potentially linked to C-8 exposure by a study conducted as part of a 2005 settlement ["Leach Settlement Agreement"] between DuPont and a class of approximately 80,000 persons residing in six water districts allegedly contaminated by C-8 from the Washington Works Plant. See Leach v. E. I. Du Pont de Nemours & Co. , No. 01-C-608 (W. Va. Cir. Ct. [ (Wood County Aug. 31, 2001), ("Leach Case") ].
(Transfer Order at 1, ECF No. 1.) DuPont utilized C-8 as a manufacturing aid in the production of Teflon.™
A. The Leach Case
As indicated by the Judicial Panel in its Transfer Order, the cases that make up this MDL are a subset of cases that originated in the Leach Case. The Leach Case was brought by a group of individuals who alleged a variety of claims under West Virginia common law tort theories for equitable, injunctive, and declaratory relief, along with compensatory and punitive damages, as a result of alleged drinking water contamination. In the Leach Settlement Agreement, the parties fashioned a unique procedure to determine whether the approximately 80,000 members of the class ("Leach Class") would be permitted to file actions against Defendant E. I. du Pont de Nemours and Company's ("DuPont") based on any of the human diseases they believed had been caused by their exposure to C-8" discharged from DuPont's Washington Works plant. (Leach *776 Settlement Agreement ("S.A."), ECF No. 820-8.)
The procedure required DuPont and the plaintiff's to jointly select three completely independent, mutually-agreeable, appropriately credentialed epidemiologists ("Science Panel") to study whether there is a connection between C-8 and human disease among the Leach Class. (S.A. at §§ 12.2.1, 12.2.2.) Pursuant to the agreed procedure the parties established in the Leach Settlement Agreement, the Science Panel established a protocol and studied numerous human diseases, examining health data and blood samples from approximately 69,000 individuals exposed to C-8 in the communities served by the water districts whose water had been contaminated with C-8 released from DuPont's Washington Works plant. (http://www.c8sciencepanel.org/c8health.html ) ("The Science Panel, as part of the Community Study, received the anonymised and non-identifiable health data collected by Brookmar [in the C-8 Health Project] to examine and analyze as part of its work."). DuPont paid the entire cost of the study which was more than $20 million dollars. (S.A. § 9.1.)
The Leach Settlement Agreement provided that the conclusions of the Science Panel's study would be issued in either a "Probable Link Finding" or a "No Probable Link Finding" for each human disease the Panel studied. (S.A. § 12.2.3.) "[T]he Probable Link reports [are] presented in detail in scientific articles (follow link [on the C-8 Science Panel website to the] Study Publications)." (http://www.c8sciencepanel.org/study.html.)
The Science Panel engaged in its work for seven years and in 2011 and 2012 issued Probable Link Findings for six human diseases, including testicular cancer, ("Linked Diseases") and No Probable Link Findings for over forty human diseases. The Leach Settlement Agreement defines "Probable Link Finding" as follows:
"Probable Link" shall mean that based upon the weight of the available scientific evidence, it is more likely than not that there is a link between exposure to C-8 and a particular Human Disease among Class Members.
(S.A. § 1.49.)
Because the Science Panel delivered a Probable Link Finding as to the six Linked Diseases, the Leach Settlement Agreement permits the individual class members to pursue the claims "for personal injury and wrongful death, including but not limited to any claims for injunctive relief and special, general and punitive and any other damages whatsoever associated with such claims, that ... relate to exposure to C-8 of Class Members" and DuPont agreed not to contest general causation in those actions. (S.A. § 3.3) (emphasis added). DuPont retained the right to contest specific causation and to assert any other defenses not barred by the Leach Settlement Agreement. (S.A. § 3.3) (emphasis added).
The parties defined general and specific causation as follows:
"General Causation" shall mean that it is probable that exposure to C-8 is capable of causing a particular Human Disease.
....
"Specific Causation" shall mean that it is probable that exposure to C-8 caused a particular Human Disease in a specific individual.
(S.A. §§ 1.25, 1.60.)
After the Science Panel delivered its Probable Link Findings and No Probable Link Findings, the individual class members whose claims are based on one or more of the Linked Diseases began to file cases in West Virginia and Ohio. DuPont moved the United States Judicial Panel on *777 Multidistrict Litigation for centralization of these individual actions pursuant to 28 U.S.C. § 1407. The Judicial Panel granted DuPont's request and on April 9, 2013, it transferred the centralized action to this Court. Ultimately, 3,542 cases were filed in or transferred to this Court as part of this MDL. Through a negotiated process, the parties chose, and this Court approved, five plaintiff's whose cases would serve as bellwether trials. The first bellwether plaintiff, Carla Marie Bartlett, tried her case to a jury in September 2015. The second bellwether case was resolved. Mr. Freeman was chosen as the third bellwether case, and will be the second case to go to a jury trial.
B. Mr. Freeman's Case
Mr. Freeman has lived in Cutler, Ohio, since 1993. The water to his residence was supplied from the Little Hocking water district, a named district in the Leach Settlement Agreement. In March 2000, when Mr. Freeman was forty years old, he felt pain in his right testis when he bumped it while taking a shower. Upon self-examination, he found what he described as a "hard testicle which turned out to have a mass inside." (Freeman Dep. at 224-25, ECF No. 4312-4.) After consulting his primary care physician, who referred him to a urologic surgeon, "he underwent a right radical orchiectomy (inguinal approach)," on April 5, 2000. (Bahnson Report at 3, ECF No. 4311-1.) Pathology revealed that his "right testicular tumor was a teratoma with both mature and immature elements: i.e. , a malignancy. Additionally, peripheral to the tumor were some seminiferous tabules demonstrating intratubular germ cell neoplasia of the unclassified type." Id. at 4. Oncologist Kelli Cawley, M.D., diagnosed Mr. Freeman "with cancer of the testis and, more specifically, teratoma with immature and mature components." Id. at 3-4. "After the surgical extraction of his right testis and teratoma, Mr. Freemans underwent a ten-year follow-up protocol which involved frequent observation via x-rays, CAT scans, and tumor markers." Id. at 4.
C. Dr. Bahnson's Opinion
To meet his burden of proving his claim that C-8 caused his testicular cancer, Mr. Freeman has proffered the expert opinion of Robert Bahnson, M.D., F.A.C.S. Dr. Bahnson is a licensed medical doctor, a surgeon, and a Board Certified urologist, a field of medical specialization in diseases of the urinary tract and the male reproductive system, who has been practicing medicine for over thirty years. He is a Professor in the Department of Urology at The Ohio State University Wexner Medical Center, which is part of The Ohio State University Comprehensive Cancer Center. He practices at the Arthur G. James Cancer Hospital and Richard J. Solove Research Institute, where he was recently the Chief of Staff. He has authored or co-authored over one-hundred peer-reviewed articles, reviews, and book chapters, many of which focus on different aspects or urologic oncology, which includes cancer of the prostate, bladder, kidney, and testicular cancer. There is no dispute that Dr. Bahnson is qualified to give an expert opinion as to the specific cause of Mr. Freeman's testicular cancer and/or his potential for future cancer.
Dr. performed a differential diagnosis on Mr. Freeman, which is discussed in detail infra , and concluded that he holds the following opinion to a reasonable degree of medical certainty:
David Freeman's exposure to C-8 in his drinking water was a substantial contributing factor in bringing about the development of his testicular cancer. Further, his cancer in the right testis now puts him at substantial risk (approximately 15% chance) for developing *778 cancer in the left testis. Additionally, because Mr. Freeman underwent (appropriately so) frequent repeated CT scanning as part of his 10 year observation protocol, his risk for developing other cancers has also increased.
Id. at 7.
DuPont has moved to exclude Dr. Bahnson's opinion.
II.
In Daubert v. Merrell Dow Pharmaceuticals, Incorporated , 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court held that the Federal Rules of Evidence, in particular Rules 702 and 104(a), govern the admission of expert witness testimony and require that the trial judge "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert , 509 U.S. at 589, 113 S.Ct. 2786. Because Rule 702 "requires that the evidence or testimony 'assist the trier of fact to understand the evidence,' " expert testimony "which does not relate to any issue in the case is not relevant and ergo, nonhelpful." Daubert , 509 U.S. at 590-90, 113 S.Ct. 2786. "In other words, there must be a 'fit' between the proposed testimony and the question(s) presented by the case at bar." Id. at 591, 113 S.Ct. 2786.
The burden is on the party proffering the expert report to demonstrate by a preponderance of proof that the opinions of their experts are admissible. Nelson v. Tenn. Gas Pipeline Co. , 243 F.3d 244, 251 (6th Cir. 2001). A district court exercise its responsibility in acting as the "gatekeeper" for expert testimony. Daubert , 509 U.S. at 588, 113 S.Ct. 2786 ; Kumho Tire Co. v. Carmichael , 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). This role, however, is not intended to supplant the adversary system or the role of the jury. In re Scrap Metal Antitrust Litig. , 527 F.3d 517, 531-32 (6th Cir. 2008). Arguments regarding the weight to be given any testimony or opinions of an expert witness are properly left to the jury. Id. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Id. (quoting Daubert , 509 U.S. at 596, 113 S.Ct. 2786 ).
To determine whether expert testimony is "reliable," the court's role, and the offering party's responsibility, "is to make certain that an expert ... employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co. v. Carmichael , 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Generally, the expert's opinions must reflect "scientific knowledge ... derived by the scientific method," representing "good science." Daubert , 509 U.S. at 590, 593, 113 S.Ct. 2786. The test of reliability is, however, a "flexible" one. Kumho Tire Co. , 526 U.S. at 140, 119 S.Ct. 1167. Any doubts regarding the admissibility of an expert's testimony should be resolved in favor of admissibility. Fed. R. Evid. 702 Advisory Committee's Notes ("[A] review of the case law ... shows that rejection of the expert testimony is the exception rather than the rule."); Jahn v. Equine Services, PSC , 233 F.3d 382, 388 (6th Cir. 2000) (stating that in Daubert "[t]he Court explained that Rule 702 displays a liberal thrust with the general approach of relaxing the traditional barriers to opinion testimony") (internal quotations omitted).
III.
DuPont argues that "David Freeman should be precluded from introducing the methodologically-unsound, unreliable, and irrelevant opinions of his specific causation expert, Dr. Robert Bahnson, at trial"
*779 based on four reasons: (A) unreliable methodology, (B) speculation as to age and tumor type evidence, (C) improper evidence of increased risk of cancer, and (D) improper suggestion that C-8 is generally accepted in the medical community as a cause of testicular cancer.
A. Methodology
Dr. Bahnson utilized a differential diagnosis to reach his specific causation opinion. As to this scientific technique, the Sixth Circuit explains:
This circuit has recognized differential diagnosis as an "appropriate method for making a determination of causation for an individual instance of disease." Hardyman v. Norfolk & W. Ry. Co. , 243 F.3d 255, 260 (6th Cir. 2001) ; see also Best [v. Lowe's Home Centers, Inc. ], 563 F.3d [171,] 178 [ (6th Cir. 2009) ] (stating that a causation opinion based upon a reliable differential diagnosis may satisfy the requirements of Rule 702 ). Differential diagnosis is "a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." Hardyman , 243 F.3d at 260 (internal quotation marks omitted). As we explained in Best , a physician who applies differential diagnosis to determine causation "considers all relevant potential causes of the symptoms and then eliminates alternative causes based on a physical examination, clinical tests, and a thorough case history." 563 F.3d at 178 (internal quotation marks omitted).
Pluck v. BP Oil Pipeline Co. , 640 F.3d 671, 678 (6th Cir. 2011).
Calling something a 'differential diagnosis' or 'differential etiology' does not by itself answer the reliability question but prompts three more:
(1) Did the expert make an accurate diagnosis of the nature of the disease? (2) Did the expert reliably rule in the possible causes of it? (3) Did the expert reliably rule out the rejected causes? If the court answers "no" to any of these questions, the court must exclude the ultimate conclusion reached.
Id. (quoting Tamraz v. Lincoln Elec. Co. , 620 F.3d 665, 674 (6th Cir. 2010) ).
" 'The core of differential diagnosis is a requirement that experts at least consider alternative causes.' " Best , 563 F.3d at 179 (quoting In re Paoli Railroad Yard PCB Lit. , 35 F.3d 717, 759 (3d Cir. 1994) ). Yet, "doctors need not rule out every conceivable cause in order for their differential-diagnosis-based opinions to be admissible." Id. at 181. "The fact that several possible causes might remain uneliminated ... only goes to the accuracy of the conclusion, not to the soundness of the methodology.' " Jahn , 233 F.3d at 390 (quoting Ambrosini v. Labarraque , 101 F.3d 129, 140 (D.C. Cir. 1996) ).
In the case sub judice , there is no dispute that Mr. Freeman was properly diagnosed with testicular cancer, which negates the need to review the first reliability element. With regard to the second element, i.e. , reliably ruling in possible causes, Dr. Bahnson considered what he believed to be all of the relevant potential causes of testicular cancer stating that "[c]ancer of the testis is relatively rare" and that "beyond C-8 and a patient's history of cancer in the other testicle, there is no generally accepted 'cause' of testicular cancer." (Bahnson Report at 5.) He further considered the "generally accepted risk factors for testicular cancer including; cryptorchidism ; a strong close family history of testicular cancer (i.e. , in a brother or father); HIV infection.... calcification of the testis," and race and age distribution. Id.
*780 As for the third element, "eliminate [ion of] alternative causes," Dr. Bahnson performed a physical examination of Mr. Freeman, reviewed his medical records from his primary care physician, oncologic surgeon, oncologist, and all of his relevant hospital, pathology, and laboratory medical records; the depositions of Mr. Freeman and his oncologist; Mr. Freeman's C-8 MDL fact sheet; the expert report of David Macintosh who opined that Mr. Freeman is a Leach Class member; the Science Panel's Probable Link Finding for the Linked Disease testicularcancer ; scholarly research by other experts; his experience, expertise, and knowledge gained through research and treatment of urologic cancers ; and, the standard methodology used in the field and practice of urologic surgery. (Bahnson Report at 4-5.) Dr. Bahnson ruled out close family history, HIV infection, calcification of the testis, and cryptorchidism because these risk factors were not applicable to Mr. Freeman. He also ruled out age and race because, while "[w]hite men appear more likely to get testicular cancer than other groups the age distribution of the cancer occurrence is bimodal: i.e. , most cases occurring in the second and third decades and the seventh decade of life, neither of which Mr. Freeman was in at the time of his diagnosis of cancer." Id. Dr. Bahnson indicated that he could not rule out C-8 because "Mr. Freeman ingested C-8 contaminated water for many years beginning no later than 1993 and thus he falls into the group of people for whom C-8 can cause testicular cancer." Id. at 6. He further testified that, Mr. Freeman "was atypical of individuals that develop cancer, and finally, the histology of his tumor, which was teratoma, is very distinctly uncommon in adult testicular tumor." (Bahnson Dep at 117, ECF No. 4312-2.)
DuPont argues that Dr. Bahnson's differential diagnosis is methodologically unreliable because (1) he failed to "consider that Mr. Freeman's testicular cancer was more likely than not the result of unknown causes," (DuPont's Mot. at 7), (2) he "failed to conduct any analysis other than a differential etiology," id. at 8, and (3) he engaged in "legally insufficient" "circular reasoning" (DuPont's Reply at 2).
1. Consideration of Unknown Causes
DuPont highlights Dr. Bahnson's testimony in which he "agreed that 'in most cases, the cause of an individual's testicular cancer is never known."; Dr, Bahnson can only determine a cause in 15% of his patients; and Dr. Bahnson agrees with the Mayo Clinic that "[i]t's not clear what causes testicular cancer in most cases." (DuPont's Mot. at 9; Bahnson Dep at 112, 51, 54.) DuPont concludes that, "Dr. Bahnson's methodology is fatally flawed, and his specific causation opinion should be excluded" because he "completely failed to consider that Mr. Freeman's testicular cancer was more likely than not the result of unknown causes-or idiopathic-as it is in the vast majority of men who get it." (DuPont's Mot. at 7): (DuPont's Reply at 13) (asserting that Dr. Bahnson "simply chose to ignore the idiopathic issue completely in his expert report"). DuPont relies upon Tamraz v. Lincoln Electric Company , 620 F.3d 665, 675 (6th Cir. 2010) to support its contention that Dr. Bahnson's methodology is unreliable because the majority of testicular cancer cases have no known cause. (DuPont's Mot. at 8.)
Mr. Freeman responds that the proposition for which DuPont cites Tamraz is not applicable to the case at bar:
DuPont's reliance on Tamraz , 620 F.3d 665 at 675... for the proposition that Dr. Bahnson's methodology is unreliable because the majority of testicular cancer cases have no known cause is misplaced. (Mot. at 8.) In Tamraz , "the Sixth Circuit rejected the expert's differential *781 diagnosis because 'his efforts to 'rule in' manganese exposure as a possible cause of the individual's disease, or to 'rule out' other possible causes turned on speculation , not a valid methodology.' In particular, the expert in Tamraz failed to cite to any non-speculative evidence for his conclusion that manganese causes Parkinson's Disease, and the expert conceded that 'he knew of no studies finding a link between manganese and Parkinson's Disease and that studies that have looked at that ... have not found a very strong correlation.' " (EMO No. 1 at 29-30.)
(Pl.'s Mem. in Opp. at 10) (emphasis added).
DuPont replies to this argument, asserting:
In Tamraz , the Sixth Circuit expressly found that where (like here) the cause of a condition is idiopathic in the majority of cases, idiopathic origin is "impossible to ignore and difficult to rule out." See Tamraz , 620 F.3d at 675. The Sixth Circuit considered this well established principle in concluding that the differential etiology opinion of a bellwether plaintiff's specific causation expert was unreliable because "unknown (idiopathic) causation currently accounts for the vast majority of Parkinson's Disease [the plaintiff's claimed injury] cases." Id. Plaintiff completely fails to acknowledge this portion of Tamraz , which is fatal to Dr. Bahnson's differential etiology opinion
(DuPont's Reply at 10.) DuPont's arguments are not well taken.
Initially, the Court notes that unlike the case at bar where only specific causation is at issue, in Tamraz the numerous expert witnesses offered opinions on general causation, specific causation, and also diagnosis, i.e. , from what disease the plaintiff in fact suffered. Tamraz , 620 F.3d at 668-69 ("Two forms of parkinsonism-Parkinson's Disease and manganism-matter here.... Every doctor to examine Jeff Tamraz has reached a different conclusion about where his case fits into this puzzle. No one disputes that he suffers from parkinsonism ; the question is what kind and from what cause."). Thus, the causation issue before the Tamraz court was a significantly more layered inquiry than the one currently before this Court.
The Court also disagrees with DuPont's contention that Mr. Freeman's "completely fails to acknowledge [a] portion of Tamraz ." (DuPont's Reply at 10.) The Tamraz court did not, as DuPont claims, "conclud[e] that the differential etiology opinion of a bellwether plaintiff's specific causation expert was unreliable because 'unknown (idiopathic) causation currently accounts for the vast majority of Parkinson's Disease [the plaintiff's claimed injury] cases." Id. (emphasis added). Instead, as Mr. Freeman correctly contends, Tamraz held that the plaintiff's expert offered an unreliable opinion because it was based on speculation as opposed to knowledge as required under Rule 702. Tamraz , 620 F.3d at 670.
That is, in Tamraz , the plaintiff's expert "Dr. Carlini opined that Tamraz has 'manganese-induced parkinsonism ' 'with a reasonable degree of medical certainty.' " Id. The court reversed the district court's admission of the opinion "[b]ecause the 'knowledge' requirement of Rule 702 requires 'more than subjective belief or unsupported speculation,' " and "the etiological component of [the expert's] conclusion-the 'manganese-induced' part-was at most a working hypothesis, not admissible scientific 'knowledge.' " Id. (citing Fed. R. Evid. 702 ). In the remainder of this section of the opinion, the Tamraz court focused nearly exclusively on the "speculative nature of [the expert's] opinion." Id. By way of *782 example, the court set out its assessment of the expert's reasoning:
(1) Tamraz was exposed to welding fumes presumably containing manganese, JA 613; (2) he developed the symptoms of Parkinson's Disease (though not those of manganism ), JA 604, 613-14, 616; (3) scientists have identified genetic factors that cause some forms of otherwise "idiopathic" Parkinson's Disease, JA 599; (4) some literature has hypothesized that toxins combined with genetics may cause other cases of Parkinson's Disease, JA 599, 601; (5) manganese is known to cause manganism, so it would be a possible candidate for triggering Parkinson's Disease as well, JA 601; (6) Tamraz may have the genes for Parkinson's Disease, JA 621; and (7) manganese may have triggered these genes and given Tamraz parkinsonism, JA 615.
Id. The court then determined that the expert's opinion was unreliable, explaining:
[The expert's method of reaching his conclusion] is a plausible hypothesis. It may even be right. But it is no more than a hypothesis, and it thus is not "knowledge," nor is it "based upon sufficient facts or data" or the "product of reliable principles and methods ... applied ... reliably to the facts of the case." Fed. R. Evid. 702.
Id. (alterations in original). The court assessed the "speculative jumps" and "leap[s] of faith" involved "in th[e expert's] chain of causation" and concluded that there were both general and specific causation problems:
Dr. Carlini's testimony thus suffers from a lack of foundation both for why manganese could causeParkinson's Disease and why manganismcaused this case of Parkinson's Disease.
Id. at 670-71 (emphasis added) ("Dr. Carlini acknowledged the speculative jumps involved in steps 4, 5 and 6 of this chain of causation-the steps necessary to his theory that manganese exposure may causeParkinson's Disease in general."; "The final step [ (i.e. , that manganese exposure caused Tamraz's disease) ] required a leap of faith as well, even ignoring the jumps required to get there.") (emphasis added).
While the Tamraz court recognized that Rule 702"does not require anything approaching absolute certainty" it nevertheless required more than speculation layered upon speculation, stating:
[W]here one person sees speculation, we acknowledge, another may see knowledge, which is why the district court enjoys broad discretion over where to draw the line. See [General Elec. Co. v. ]Joiner , 522 U.S. [136] at 139, 118 S.Ct. 512 [139 L.Ed.2d 508 (1997) ]. Yet, so long as there is a line, some forms of testimony may cross it, and that happened here. Dr. Carlini's opinion contains not just one speculation but a string of them: A suggests by analogy the possibility of B, which might also apply to C, which, if we speculate about D, could eventually trigger E, so perhaps that happened here. At some point, the train becomes too long to pull and the couplings too weak to hold the cars together.
Id. at 672. In the instant action, DuPont makes no argument, nor is there a viable one to be made, that Dr. Bahnson layers speculation upon speculation.
Moreover, the Court notes that the portion of Tamraz relied upon by DuPont is in the section in which the court addresses the plaintiff's "unconvincing" arguments and "distinguish[es] the cases on which Tamraz relie[d] to admit 'differential diagnosis' testimony." Id. at 675. In that section, the court, inter alia , discusses the plaintiff's defense of Dr. Carlini's testimony, explaining that for the reasons it already stated the testimony failed on the *783 "ruling in" and "ruling out" elements of a differential diagnosis:
Dr. Carlini's opinion fails the last two prongs because, for the reasons already given, his efforts to "rule in" manganese exposure as a possible cause or to "rule out" other possible causes turned on speculation , not a valid methodology. No matter the label, the testimony does not satisfy Rule 702.
Id. at 674 (emphasis added).
The Tamraz court went on to distinguish the case upon which the plaintiff relied to support his position that his expert's differential diagnosis should not be excluded. The language relied upon by DuPont was used when the court was comparing the two experts' methods of "ruling out" possible causes:
In Best , the doctor also reliably ruled out most alternative causes; the defendant argued that the doctor also should have ruled out another possible factor but did not provide any evidence that this factor could cause the disease. 563 F.3d at 181. Here, though, the other possibility-unknown (idiopathic) causation-currently accounts for the vast majority of Parkinson's Disease cases, making it impossible to ignore and difficult to rule out.
Id. This comparison of the facts between these two cases reflects the Tamraz court's recognition that difficulties can arise in differential diagnoses directed at diseases where the majority of cases have unknown causation. It does not stand for the proposition that all differential diagnoses are unreliable when the cause of a disease is unknown in the majority of cases.
In the case sub judice , Dr. Bahnson recognizes in his differential diagnosis that "beyond C-8 and a patient's history of cancer in the other testicle, there is no generally accepted 'cause' of testicular cancer." (Bahnson Report at 5.) Thus, Dr. Bahnson did not "simply choose to ignore the idiopathic issue completely," as DuPont contends. Further, the Court clarifies that idiopathic does not mean that mere is no cause in the majority of cases; idiopathic means there is no known cause in the majority of cases. (Schoenberg Dep. at 114, ECF No. 4308-1) (DuPont's specific causation expert "would agree with" the "characterization of idiopathic" as it "does not mean that there is no cause; idiopathic means there is no known cause"). Dr. Bahnson did not ignore this proposition. And, importantly, in contrast to Tamraz where the court recognized that the expert "conceded he knew of no studies finding a link between manganese and Parkinson's Disease," here the Science Panel issued a Probable Link Finding for testicular cancer, which provides not just reliable and admissible evidence but an agreed conclusion made by the parties that "it is more likely than not that there is a link between exposure to C-8 and [testicular cancer ] among Class Members." (S.A. § 1.49.)
Last, the Court notes that DuPont's proposition that Dr. Bahnson was required to "consider that Mr. Freeman's testicular cancer was more likely than not the result of unknown causes," misstates the inquiry. Dr. Bahnson was required to consider that no cause is found in the majority of cases of testicular cancer - which he did. He was not required to consider that Mr. Freeman's cancer was more likely than not the result of unknown causes. Indeed, that statement is a conclusion - a conclusion on which the parties' specific causation experts disagree.
2. Analysis Beyond a Differential Diagnosis
DuPont argues that Dr. Bahnson's expert opinion is inadmissible because he "failed to conduct any analysis other than a differential etiology." (DuPont's Mot. at *784 8.) DuPont maintains that a differential diagnosis "alone is not a reliable methodology where, as here, the condition at issue is idiopathic in the vast majority of cases." Id. at 8. Specifically, DuPont posits:
Dr. Bahnson relied exclusively on a differential etiology methodology to arrive at his specific causation opinions in this case, despite the well-accepted rule that differential etiology alone is not a reliable methodology where the cause of the disease is unknown in the majority of cases. Plaintiff wants the Court to simply disregard this rule, claiming for the first time in his brief that Dr. Bahnson was able to "rule out" idiopathic etiology in Plaintiff's case because under the Court's current rulings, C-8 exposure is capable of causing testicular cancer in Leach Class Members.
....
Because this new "basis" for Dr. Bahnson's specific causation opinion was not timely disclosed in his report, and was not even disclosed at Dr. Bahnson's deposition, it should be disregarded by the Court. As this Court knows, Rule 26 requires that an expert report contain a "complete" statement of all opinions to be expressed at trial, see Fed. R. Civ. P. 26(a)(2)(B), and requires a party to "supplement or correct" that report if at some point in time if the expert considers new information or if the expert's opinions change. See Fed. R. Civ. P. 26(e). Courts frequently exclude new opinions, such as the ones presented in Plaintiff's Opposition, that were not timely disclosed in the expert's report. See, e.g., Park W. Galleries, Inc. v. Global Fine Art Registry, LLC [2010 WL 891695, *4], 2010 U.S. Dist. LEXIS 20444, at *10-12 (E.D. Mich. Mar. 8, 2010) (granting motion to exclude expert testimony outside scope of respective reports, holding that the scope of any witness testifying in his or her capacity as an expert will be "limited to the subject matter he or she timely disclosed in his or her Rule 26(a)(2)(B) expert report"); Asher v. Unarco Material Handling, Inc. [2008 WL 2596612, at *3], 2008 U.S. Dist. LEXIS 48918, at *8-12 (E.D. Ky. June 25, 2008) (granting motion to preclude party from using new opinions of its experts at trial where the experts were attempting to offer testimony "outside the scope of opinions contained in the original reports"); Sadler v. Advanced Bionics, LLC [2013 WL 1385386, *1], 2013 U.S. Dist. LEXIS 47966, at *2 (W.D. Ky. Apr. 3, 2013) (excluding evidence "from expert witnesses that is outside the scope of their written opinion or pretrial deposition testimony")
(DuPont's Reply at 1, 4)
At the outset, the Court disagrees with DuPont's assessment that "under the Court's current rulings, C-8 exposure is capable of causing testicular cancer in Leach Class Members." The Court's current rulings are not the source of the determination that C-8 exposure is capable of causing testicular cancer in Leach Class Members. The parties agreed in the Leach Settlement Agreement to have this general causation issue determined by the Science Panel's epidemiological study, which was concluded with the Probable Link and No Probable Link Findings- not this Court's rulings.
Further, this is not the first time Mr. Freeman has taken the position that his testicular cancer is not idiopathic. An idiopathic disease is defined as "one that exists without any connection with any known cause." The Free Medical Dictionary, http://medical-dictionary.thefreedictionary.com/idiopathic. See also Dictionary.com, www.dictionary.com ("of unknown cause"); Cambridge Dictionaries Online, www.dictionary.cambridge.org ("an idiopathic disease or medical condition has no known cause"). Mr. Freeman has always *785 taken the position that his testicular cancer was caused by C-8, which by definition means that he does not believe it is of unknown cause in his case. And, while Dr. Bahnson recognized that the majority of cases of testicular cancer are of unknown origin, in 15% of his patients he can determine a cause of the testicular cancer. Thus, even if Dr. Bahnson had taken this position for the first time, it is certainly not "outside the scope" of his report and/or deposition testimony as the cases upon which DuPont relies prohibit.
Finally, the Court points out that DuPont's framing of this issue throughout its briefing as whether Dr. Bahnson "rul[ed] out idiopathic causation" confuses the inquiry, as can be seen by the following exchange in Dr. Bahnson's deposition:
Q. And what methodology do you use that allows you to say that Mr. Freeman's testicular cancer would not have resulted but for his exposure to C-8 from Du Pont's plant?
A. The medical reasoning, I think we've covered this earlier in the deposition, that he didn't have any of the known risk factors for cancer, his age was atypical of individuals that develop cancer, and finally, the histology of his tumor, which was teratoma, is very distinctly uncommon in adult testicular tumor.
Q. Do you claim that you ruled out idiopathic causes for Mr. Freeman's testicular cancer ?
A. That question makes no sense. Idiopathic means there's no known cause.
(Bahnson Dep at 117:7-22.) Indeed, the scientific method[1] actually precludes the statement that there is no cause of testicular cancer, as opposed to no known cause. For example, no scientist has ever found extraterrestrial life. But, the scientific method would preclude saying that extraterrestrials do not exist-only that there is no verifiable or known scientific finding of their existence. Similarly, here, it cannot be said that there is no cause of testicular cancer-only that there is no known cause in the majority of cases.
Additionally, the Court disagrees with DuPont's position that there is a "well-accepted rule that differential etiology alone is not a reliable methodology where the cause of the disease is unknown in the majority of cases." In other words, DuPont's position is that in a situation where the cause of a disease is unknown in the majority of cases, a plaintiff may not rely on a valid and reliable differential diagnosis, but must instead provide a second opinion based upon a different reliable and valid methodology to support specific causation. The Court finds no such well accepted rule in the case law, finding dispositive distinguishing factors in the cases to which DuPont cites.
For example, while DuPont correctly points out that the Eighth Circuit in Bland v. Verizon Wireless, (VAW) L.L.C. stated: "Where the cause of the condition is unknown in the majority of cases, [an expert] cannot properly conclude, based upon a differential diagnosis, Bland's exposure to freon was 'the most probable cause' of Bland's exercise-induced asthma." 538 F.3d 893, 897 (8th Cir. 2008) (an employee claimed she ingested freon after another employee sprayed canned-air containing freon into her water bottle, contending that her ingestion of freon caused her to suffer exercise-induced asthma ). However, as Mr. Freeman correctly explains, the Bland court made that statement in the midst of an analysis where it was clear that the plaintiff's expert failed to, inter *786 alia , rule out other known sources. Id. at 897 ("The district court excluded [the expert]'s causation testimony because [she] (1) failed scientifically to eliminate other possible causes as part of her differential diagnosis; ...."). Further, unlike exercise induced asthma, the members of the Leach Class who were diagnosed with testicular cancer may rely upon the Probable Link Finding "that it is more likely than not that there is a link between exposure to C-8 and" their testicular cancer. (S.A. § 1.49: "it is more likely than not that there is a link between exposure to C-8 and [testicular cancer ] among Class Members").
Finally, even if DuPont were correct about the Bland holding, Tamraz is the only Sixth Circuit case that cites to Bland , and Tamraz does not rely on it for the proposition that a differential etiology alone is not a reliable methodology where the cause of the disease is unknown in the majority of cases. Tamraz , 620 F.3d at 675. And, the only district court in this circuit to cite to Bland is Dickson v. Natl. Maintenance & Repair of Kentucky, Incorporated , No. 5:08-CV-00008, 2011 WL 12538613 (W.D. Ky. Apr. 28, 2011), which too did not cite it for that proposition. In Dickson , the defendant argued that the plaintiff's expert's "failed to consider that multiple myeloma is an idiopathic disease." The Dickson court disagreed, denying exclusion of the expert's opinion, stating: "The Court finds that Dr. Brautbar's differential diagnosis adequately accounts for other possible causes of Plaintiff's disease, including idiopathic origin." Id. at *11. Similarly, here, as explained in detail above, Dr. Bahnson adequately accounted for idiopathic origin.
3. Circular Reasoning
In its last argument as to why Dr. Bahnson's differential diagnosis is unreliable, DuPont contends that "Dr. Bahnson engages in circular reasoning that has been soundly rejected as legally insufficient by numerous courts in situations like the one present here." (DuPont's Reply at 3.) DuPont raises two arguments in this regard,
First, DuPont highlights Dr. Bahnson's deposition testimony, "including his acknowledgments that: 'some people who live in the area around the plant would get testicular cancer anyway' for reasons unrelated to C-8 exposure; men were developing testicular cancer in the area around the plant long before DuPont started using C-8 at the plant; and Plaintiff could have developed his testicular cancer even without any exposure from the plant." (DuPont's Reply at 3) (citing to Bahnson Dep. at 11, 116). DuPont continues, stating that "Dr. Bahnson simply assumes that, because C-8 is assumed to be a possible cause of testicular cancer for Class Members, something unknown (idiopathic) could not have caused Plaintiff's testicular cancer." Id. at 5.
The Court finds DuPont's assessment of Dr. Bahnson's analysis inaccurate. As can be seen by his differential diagnosis (discussed in more detail above), Dr. Bahnson did not simply assume that Mr. Freeman's cancer was caused by C-8 because it was a possible cause. Dr. Bahnson performed a physical examination of Mr. Freeman, reviewed his medical records from his primary care physician, oncologic surgeon, oncologist, and all of his relevant hospital, pathology, and laboratory medical records; the depositions of Mr. Freeman and his oncologist; Mr. Freeman's C-8 MDL fact sheet; the expert report of David Macintosh who opined that Mr. Freeman is a Leach Class member; the Science Panel's Probable Link Finding for the Linked Disease testicularcancer ; scholarly research by other experts; his experience, expertise, and knowledge gained through research and treatment of urologic cancers ; and, the standard methodology used in the field and practice of urologic surgery, (Bahnson *787 Report at 4-5.) He considered, the rarity of testicular cancer, the fact that "beyond C-8 and a patient's history of cancer in the other testicle, there is no generally accepted 'cause' of testicular cancer and all of the "generally accepted risk factors for testicular cancer." Id. He then ruled out close family history, HIV infection, calcification of the testis, and cryptorchidism because these risk factors were not applicable to Mr. Freeman. He also ruled out age and race, because Mr. Freeman "was atypical of individuals that develop cancer" and the "histology of his tumor, which was teratoma, is very distinctly uncommon in adult testicular tumor." (Bahnson Dep at 117, ECF No. 4312-2.)
That being said, the cases upon which DuPont relies for its proposition are both easily distinguished in that the expert witnesses in those cases failed to utilize any methodology. In Mills v. Riggsbee , No. 12-148, 2014 WL 1154060 (E.D. Ky. Mar. 20, 2014), the issue was whether a hose utilized by fire departments was defective. The expert failed to offer "evidence of any sort of analysis," which "result[ed] in a complete gap between the data and the opinion proffered." Id. at *5 ("There is simply no information before the Court explaining how [the expert] got from 'point A' (the hose jumped) to 'point B' (therefore water hammer must have occurred)."). Instead of utilization of a reliable method, the expert "offer[ed] nothing more substantive than [he] will testify that the hose jumped because of water hammer; he knew it was water hammer because the hose jumped." Id.
Similarly, in Sutherland v. Matrixx Initiatives, Incorporated , No. 04-AR-0129, 2006 WL 6617000 (N.D. Ala. Nov. 7, 2006), the court found that a single frozen "cadaver study suffer[ed] from a number of major methodological flaws," Id. at *6, *7 ("Placing a Zicam bottle far up the nostril of one half of a defrosted, septum-less cadaver head does not strike this court as a sufficient scientific basis for concluding that Zicam can be expected to reach the olfactory epithelium.").
Unlike the experts in Mills and Sutherland , Dr. Bahnson utilized a differential diagnosis, which, as stated above, the Sixth Circuit has recognized as an "appropriate method for making a determination of causation for an individual instance of disease." Hardyman v. Norfolk & W. Ry. Co. , 243 F.3d 255, 260 (6th Cir. 2001).
Second, DuPont argues that "Dr. Bahnson's circular logic ... ignores the undisputed fact that just because someone has a history of a potentially causal risk factor, that does not mean that the risk factor in fact caused the disease in that individual." (DuPont's Reply at 6.) DuPont relies upon several cases for the proposition that "the presence of a known risk factor is not a sufficient basis for ruling out idiopathic origin in a particular case, particularly where most cases of the disease have no known cause." Id. (citing Hendrian v. Safety-Kleen Sys. , 2014 WL 1464462, at *7, 2014 U.S. Dist. LEXIS 51726, at *20 (E.D. Mich. Apr. 15, 2014) ; Henricksen v. ConocoPhillips Co. , 605 F.Supp.2d 1142, 1162 (E.D.Wash. 2009) ("Standing alone, the presence of a known risk factor is not a sufficient basis for ruling out idiopathic origin in a particular case, particularly where most cases of the disease have no known cause."). Here, however, unlike the cases upon which DuPont relies, Dr. Bahnson does not rely only on the presence of C-8 to reach his conclusion. As shown above, he "ruled in" potential causes and "ruled out" other potential causes.
The final case upon which DuPont relies is "[a] recent decision from an MDL in the District Court of South Carolina, In re Lipitor (Atorvastatin Calcium) Mktg., 2015 U.S. Dist. LEXIS 168335 (D. S.C. Dec. 11, 2015), [which it maintains] is instructive in *788 understanding the flaws in Dr. Bahnson's assumption of specific causation here." (DuPont's Reply at 8.) DuPont highlights the In re Lipitor court's assessment that "[e]ssentially, the putative expert followed the flawed logic that if general causation exists then specific causation exists for every patient that took Lipitor and thereafter developed diabetes." Id. (citing In re Lipitor , 2015 U.S. Dist. LEXIS 168335, at *22). DuPont concludes that "Dr. Bahnson makes the same mistake as the putative expert in Lipitor -assuming specific causation based on nothing more than a general causation finding." Id. at 9.
In re Lipitor , however, is distinguishable in numerous ways from the case at bar. Taking just one of those ways, which is sufficient for the instant analysis, the In re Lipitor expert "recognized that Plaintiff had a number of statistically significant risk factors for diabetes beyond ingestion of Lipitor, including her BMI, recent weight gain, total adult weight gain, age, family history, hypertension and possibly metabolic syndrome." In re Lipitor , 2015 U.S. Dist. LEXIS 168335, at *41-42. The court further recognized the undisputed fact that "[m]any of these risk factors greatly exceed the risk of developing diabetes associated with Lipitor." Id. at *42. The court, inter alia , stated that "[t]he powerful evidence that Plaintiff's many other risk factors can independently cause diabetes and cannot be ruled out further undermine Dr. Murphy's testimony. The gap between the available scientific evidence and Dr. Murphy's opinions are too great to survive a Rule 702 review." Id. (emphasis added). In the instant action, however, there is not even a contention that Mr. Freeman has any statistically significant risk factors for testicular cancer beyond ingestion of C-8. That fact takes Dr. Bahnson's analysis outside of the scope of cases for which In re Lipitor could be instructive.
DuPont's criticisms of Dr. Bahnson's explanations and/or conclusions goes to the weight of the evidence, not its admissibility, and is appropriately left to "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction of the burden of proof," rather than exclusion. Daubert , 509 U.S. at 596, 113 S.Ct. 2786 ; United States v. Davis , 103 F.3d 660, 674 (8th Cir. 1996) (noting that the defendant was "free to challenge the expert's conclusions and point out the weaknesses of the [expert's] analysis to the jury during cross-examination" but "[w]eight and credibility are the province of the jury.").
B. Speculation
DuPont argues that "Dr. Bahnson's reliance on Mr. Freeman's age at diagnosis and tumor type (teratoma ) as 'evidence' that C-8 substantially contributed to Mr. Freeman's development of testicular cancer is scientifically unsupported and rank speculation." (DuPont's Mot. at 1.) DuPont maintains that "[n]either the Science Panel's Probable Link Report on cancer nor any other medical or scientific source has ever linked C-8 exposure to the development of testicular cancer at a certain age or to the development of a specific type of tumor in humans." Id. at 2. Therefore, DuPont concludes that "Dr. Bahnson manufactured this unsupported, speculative theory solely for purposes of Mr. Freeman's litigation, he should be excluded from offering it at trial." Id.
This issue, however, has been rendered moot by Mr. Freeman's response that DuPont misunderstands or misconstrues Dr. Bahnson's opinions concerning the relevance of Mr. Freeman's age and tumor type, which merely form a part of his differential diagnosis. DuPont does not oppose admission of Dr. Bahnson's reliance on these factors as part of his differential *789 diagnosis. And, Mr. Freeman confirms that "Dr. Bahnson does not intend to offer the opinion that Mr. Freeman's age and tumor type are indicative of C-8-induced testicular cancer as DuPont posits." (Pl.'s Mem. in Opp. at 17.)
C. Increased Risk of Cancer
DuPont next takes issue with Dr. Bahnson's opinions related to Mr. Freeman's increased risk of developing cancer in his left testis as a result of his prior cancer in his right testis, and his increased risk of developing cancer as a result of his continued monitoring for cancer. DuPont argues that the evidence supporting either of these propositions is not "reasonably certain" which is required under Ohio law. (DuPont's Mot. at 14) (citing, inter alia, Bouchard v. Am. Home Prods. Corp. , 213 F.Supp.2d 802, 807 (N.D. Ohio 2002) ("Ohio law does not permit recovery for the 'mere possibility' that a plaintiff may develop a condition because that would invite speculation by the jury."). In his opposition memorandum, Mr. Freeman indicates that he does not offer the evidence to prove that he will develop cancer in the future, but instead to support his emotional distress, which he alleges manifested itself as cancerphobia.
"Cancerphobia is a claimed present injury consisting of mental anxiety and distress over contracting cancer in the future, as opposed to risk of cancer, which is a potential physical predisposition of developing cancer in the future." Cantrell v. GAF Corp. , 999 F.2d 1007, 1012 (6th Cir. Ohio 1993) (quoting Lavelle v. Owens-Corning Fiberglas Corp. , 30 Ohio Misc. 2d 11, 507 N.E.2d 476 (1987) ). DuPont posits that, because it is entitled to summary judgment on Mr. Freeman's emotional distress claims, "any suggestion that Mr. Freeman is at an increased risk of developing cancer in the future is irrelevant, would unfairly prejudice DuPont, and should be excluded from Plaintiff's trial." (DuPont's Reply at 15.)
This Court, however, in ruling on DuPont's Motion for Summary Judgment on Mr. Freeman's Emotional Distress Claims, found that while Mr. Freeman's allegations related to his fear and anxiety over contracting cancer in the future do not state an independent claim for negligent infliction of emotional distress, they do constitute a separate injury that may be compensated as a portion of damages in his negligence claim. (Dispositive Motions Order No. 14, ECF No. 4458.) To recover those requested damages for cancerphobia, Mr. Freeman must show that he was aware that he in fact possesses an increased statistical likelihood of developing cancer, and that from this knowledge springs a reasonable apprehension which manifests itself in mental distress. See Cantrell v. GAF Corp. , 999 F.2d 1007 (6th Cir. 1993) (citing Lavelle , supra , for the proposition that damages for cancerphobia were available as a portion of damages in a negligence action where the plaintiff's suffered a contemporaneous physical injury, if the plaintiff could show that he "is aware that he in fact possesses an increased statistical likelihood of developing cancer, and that from this knowledge springs a reasonable apprehension which manifests itself in mental distress").
Consequently, as the Sixth Circuit has recognized, "[e]vidence of an increased risk of cancer is relevant to whether a plaintiff's fear of cancer is reasonable, as required by Lavelle .... [and] [t]his evidence, in addition to the evidence that [a plaintiff] had an actual fear or concern about the risk of cancer were the necessary predicates for the mental anguish damages they sought." Id. at 1012 (holding that "[t]he district court's admission of the risk of cancer evidence was therefore proper"). Accordingly, the evidence Mr. *790 Freeman seeks to introduce related to his alleged increased risk of developing cancer is relevant and probative.
D. Generally Accepted and Causation
In its Motion, DuPont raises an argument related to its understanding that Dr. Bahnson intends to opine that C-8 is "generally accepted" as a "cause" of testicular cancer. (DuPont's Mot. at 16-18.) DuPont acknowledges "that this issue may be moot based on a discussion between counsel during Dr. Bahnson's deposition." Id. at 2, n.1. Mr. Freeman responds that Dr. Bahnson did not intend to "proffer the opinion at trial that C-8 is generally accepted in the medical community as a cause of testicular cancer." (Pl.'s Mem. in Opp. at 20, n.10.) Thus, in reply DuPont states that it "now understands this specific issue to be moot, based on the agreement of Plaintiff's counsel not to offer any such evidence." (DuPont's Reply at 15.) Beyond that understanding, however, the parties disagree as to the phrasing Dr. Bahnson may use.
DuPont objects, however, not to language utilized by Dr. Bahnson, but instead to Mr. Freeman's "claim in the Opposition that it is 'indisputable and uncontestable in this litigation that C-8 is, in fact, a cause of testicular cancer for Class Members, which Mr. Freeman is ....' " (DuPont's Reply at 16) (quoting Pl.'s Mem. in Opp. at 20) (emphasis added by DuPont). The parties do not cite the Court to any testimony or written opinion by Dr. Bahnson where he states that C-8 is, in fact, a cause of testicular cancer for class members, nor does DuPont request exclusion of any testimony.
In his expert report, Dr. Bahnson states:
On April 15, 2012, the C8 Science Panel concluded on the basis of epidemiologic and other data available that, "among class members," "there is a probable link between exposure to C8 (also known as PFOA) and testicular cancer.... [and] [i]n addition, the expert report of Dr. David Macintosh concludes that Mr. Freeman is a Class Member due to his exposure to C8 in his drinking water, and thus at an increased risk for developing testicular cancer."
....
From my review of Mr. Freeman's deposition, as well as Dr. Macintosh's expert report, it is clear that Mr. Freeman ingested C8 contaminated water for many years beginning no later than 1993 and thus he falls into the group of people for whom C8 can cause testicular cancer."
(Bahnson Report at 6.) The phrasing Dr. Bahnson utilized in his expert report is not objectionable. The phrasing he utilizes is in accord with the contractual language the parties established in the Leach Settlement Agreement. (S.A. § 1.49: "it is more likely than not that there is a link between exposure to C-8 and [testicular cancer ] among Class Members") ( (S.A. § 1.25) ("it is probable that exposure to C-8 is capable of causing" testicular cancer ).
Thus, the phrasing regarding general causation and the Science Panel's Probable Link Finding is more nuanced than that used by Mr, Freeman. As guidance, the Court utilizes the statement objected to as an example, the more appropriate phrasing reflecting the Leach Settlement Agreement is that it is indisputable and uncontestable that C-8 is, in fact, capable of causing testicular cancer in the Leach Class members. And, no expert can opine that C-8 is incapable of causing testicular cancer in a Leach Class member.
IV.
In accordance with the foregoing, the Court DENIES DuPont's Motion to Exclude the Testimony of Trial Plaintiff David Freeman's Specific Causation Expert, *791 Dr. Robert Bahnson. (ECF No. 4314.)
IT IS SO ORDERED.

The scientific method is "a method of research in which a problem is identified, relevant data are gathered, a hypothesis is formulated from these data, and the hypothesis is empirically tested." Dictionary.com, www.dictionary.com/browse/scientific-method.